MONROE, C. J.
Defendant was prosecuted for murder, found guilty, without capital punishment, and duly sentenced, and she presents her case to this court upon a bill of exception to the overruling of a motion for new trial; the grounds here urged in support of the motion and bill being that one of the jurors was prompted in the finding of the verdict by the consideration of matters not developed by the evidence, and was prejudiced against defendant to such an extent as to prevent his giving her a fair trial, and that, since the trial, defendant has discovered new evidence, material to the case, which had not previously come to her knowledge, and which she was unable to obtain.
[1] 1. The first ground, more fully stated, is that one of the jurors, upon the day after the conviction, made the following statement to a reporter for one of the daily newspapers, who sought, and obtained, an interview with him at his residence, to wit:
“These women may be right in thinking that, because other women here were acquitted for similar crimes, Augusta Edwards should have had her freedom, but they have no right to abuse an honest jury because it did.its duty. Viewing the mass of evidence, look what the defendant was threatened with! This cold-blooded murdering of men must be stopped. Why make a *534 mockery of the law? We, as jurors, had sworn to do our duty. Suppose Augusta Edwards had been turned loose, who would have been the next victim? Who would have been the next man to be shot down in the street by some woman? I maintain that, Katie Eretsch and Mamie McLaughlin should never have been given their freedom. If they had been convicted, it is probable that Augusta Edwards would never have been in a courtroom. If they start a campaign to contest the jury’s verdict and free Augusta Edwards, I will never serve on another jury in a capital case during the rest of my life.”
It is well settled that a statement such as the foregoing could not be received from the juror himself in support of an attack upon the verdict in which he participated, and, a fortiori, that it is inadmissible .as coming from a third person. As was said, by this court, in State v. Barrett, 117 La. 1086, 42 South. 513:
“If jurors could vitiate their verdict by simply going about and making statements _ about their mental condition while sitting' as jurors, or, worse still, if verdicts could be vitiated by simply offering testimony as to what one or more jurors had said after the verdict had been rendered, there would be little stability in verdicts.”
See, also, State v. Bird, 38 La. Ann. 497; State v. Richmond, 42 La. Ann. 299, 7 South. 459; State v. Corcoran, 50 La. Ann. 453, 23 South. 511; State v. Cunningham, 123 La. 870, 49 South. 601; State v. Cloud, 130 La. 955, 58 South. 827, Ann. Cas. 1913D, 1192; 12 Cyc. 749.
Even if there were no such rule, however, we find nothing in the statement quoted which would authorize the assumption that the juror to whom it is attributed was influenced in the finding of the verdict in this case by any other considerations than those arising from the facts disclosed by the evidence that was adduced on the trial, and by the obligation to apply thereto the law as declared by the trial judge. “These women,” to whom the juror referred, we take to have been certain members of the community who had hastened to criticize the verdict, and the remarks of the juror to the reporter were evidently made in answer to that criticism, not as indicating that he had participated in a conviction which was not justified by the law and the evidence, but as indicating that, in the face of evidence calling for a conviction, a jury should not be influenced by any other consideration. The reference to the cases of Katie Eretsch and Mamie McLaughlin was probably suggested by testimony which the juror had heard on the trial, from a witness who said that hé had interviewed defendant immediately after she had committed the homicide for which she was being tried, and whose testimony ran, in part, as follows:
“I asked Miss Edwards whether it was a fact that she had written the suicide note, and she said ‘Yes.’ In fact the nature of my interview was leading, all my questions were leading, and her answers to me were ‘Yes.’ I asked her, after speaking about the suicide note, I said, ‘Well,, after you killed the man you changed your mind;’ she said, ‘Yes.’ And I said, ’Why; because you didn’t want to suffer too?’ She said, ‘Yes.’ I then said, ‘Do you mean by that that you think that you will not suffer for this, either physical pain or any other kind of pain?’ —I didn’t use those words, but asked her if she thought she wouldn’t suffer; she said, ‘Yes.’ And I said, ‘You mean — in other words, you don’t think you will have to pay 'any legal penalty for this?’ she said, ‘Yes.’ I said, ‘Why, because other women have committed such offenses as you have, and not paid the penalty?’ she said, ‘Yes.’ I said, ‘Do you refer to Mamie McLaughlin and Katie Eretsch?’ she said, ‘Yes.’ Then I said, ‘You mean, you think no jury would convict you for such a crime as this?’ she said, ‘Yes.’ ”
It may be stated, by way of explanation, that defendant had written a note, which was found in her possession, after the homicide, and in which she declared that she “premeditated murder and suicide,” and made a request with regard to the disposition of her body; that she testified, on the triai, that Riehl (the man whom she killed) had seduced her. And it is a fact (not testified to) that Mamie McLaughlin and Katie Fretsch had, not long before, been acquitted of charges of murder in similar cases.
[2] 2. The newly discovered testimony to *536 which the motion for new trial refers is that of Messrs. Castaing and Chabaud, concerning the demeanor of the defendant, within the week preceding the homicide; and that of Drs. Mann and Unsworth, expert alienists, or nerve specialists, who, after the conviction, examined the defendant, read “much of the testimony” which was given on the trial, and interviewed some of the witnesses, and “upon that basis gave an opinion as to her mental condition at the time of the homicide.
The purport of the testimony expected to be elicited from Messrs. Castaing and Chabaud, as indicated by their affidavits, is that they occupy intercommunicating offices in a building in this city; that prior to the homicide the decedent, Riehl, being out of employment, frequented the office of Chabaud, and received his mail there; that for the better part of two days within the week preceding the homicide, the defendant appeared, and, inquiring for Riehl, was permitted to occupy a chair in the office of Castaing; that she remained perfectly quiet, save that now and then she would leave her chair to go into the office of Chabaud; that she would answer, briefly, questions that were propounded, but otherwise seemed indisposed to conversation; that she declined offers of refreshment, in the way of coffee or sandwiches, at the luncheon hours; that when she spoke of her mission (i. e., that she was waiting for Riehl) she exhibited excitement, in that her color rose and the veins in her face became conspicuous; that when Castaing warned her that he would not like any trouble between her and Riehl to occur in his office she assured him that there would be none, that she would meet Riehl when he came in, and that they would leave the office quietly together. Castaing further states that, a day or two after the two thus referred to, he observed defendant seated at the foot of the elevator shaft, and that as he passed in and out she remained either seated or standing, at or near the same spot; “that, in his opinion, she was ‘bughouse,’ meaning out of her mind and not in her right sense.” He also states that he was standing one day, about that time, at the corner of St. Charles, or Carondelet, and Common streets, when she ran excitedly across the street towards him, passing in front of a rapidly moving ear, and said, in an excited manner, gesticulating wildly, “Have you seen George Riehl?” that he answered in the negative, and that she then shouted, “I’ll find him; his time is short.” His affidavit also contains a recital of some parts of a conversation that he had had with Riehl, concerning his relations with the defendant. Chabaud concludes his affidavit by saying that, in his opinion, defendant’s actions, as he observed them in his office, “were very, very strange, and he has never seen any other person act in that manner.”
In ruling upon the question presented to him, the trial judge no doubt took into consideration the facts; that a period of six months had elapsed between the date of the indictment of the defendant and that of her trial, that her trial and her defense of insanity attracted great public attention, and that a great deal of testimony of the same character as that which was expected to be elicited from Castaing and Chabaud had actually been heard by the jury. It is true that the facts within the knowledge of those two men do not appear to have been brought to “the attention of defendant’s counsel until after her conviction, but they were at all times within the knowledge of the defendant, and not even the experts, whose affidavits and certificates are attached to the motion for new trial, intimate that she has been otherwise than perfectly sane at any time since the moment of the homicide. The relatives and friends of the defendant and those by whom she had been employed, or with whom *538 she had been associated, prior to the homicide, were called to testify in support of her defense, and by a comparison of dates it appears that their testimony is confined exclusively to the period subsequent to the time when, according to her own testimony, she had yielded herself to Riehl, and subsequent to that when he had begun to manifest a disposition to break off their relations. The consensus of their testimony is that, as a girl and a woman, she had a high temper, but there is no intimation of anything like insanity until after the epoch above mentioned, nor does it appear that any member of her family was ever so affected. According to their relationship to her and their opportunities for observing, defendant impressed the witnesses, who were ignorant of the existence of any reason therefor, as having changed, and as having become absent-minded, unable to concentrate her attention, abrupt in her manner, irritable, and, in what she might have supposed was the privacy of her own bedchamber, prone at times to abandon herself to feelings of distress and desperation. To one witness, to whom she was brought, not long before the homicide, to confide her deplorable secret, she expressed the belief or suspicion that Riehl had found another woman, and she uttered threats that she would kill him and herself, and she then protested that she loved him and would hear nothing to his prejudice. There is a witness who testified that, within the week preceding the homicide, she spent the greater part of a day waiting at the foot of the elevator in an office building, other, as we understand it, than that in which Oastaing and Chabaud were established, the fact, as we infer, being that Riehl was endeavoring to escape her, and that she was unable, for some little time, to find him. Eventually, however, she appears to have learned that he had obtained employment in a business house on Carondelet street, and that the office in which he worked was upstairs, and accessible only by means of a stairway which opened upon the sidewalk, and was flanked on one side by a show window, or show case, which afforded a sort of alcove in which she could stand, without, perhaps, attracting the attention that she would otherwise have attracted. She appears accordingly to have stationed herself at that point in the early afternoon of July 24, 1913, and to have remained there until after 7 o’clock in the evening, and, when at that time Riehl came out, to have joined and walked with him for a short distance, and then to have taken a pistol from a satchel and to have killed him, firing several shots at his body after he fell.
One of the witnesses, who had known her for some 15 years, testifies that at about 5 o’clock, he stopped and had quite a long conversation with her, that she told him that she was waiting for a friend, that she was entirely rational in her manner, and that he spoke to her again an hour or more later, and found her in the same condition. There are quite a number of witnesses who testify to the actual killing of Riehl, to the surrender by defendant of the pistol that she had used; to her arrest, and to remarks made by and interviews had with her then and thereafter; and, one and all, they agree that she appeared to be cool and self-possessed.
Defendant, having taken the stand as a witness in her own behalf, testified to certain of the facts which led to the tragedy out of which this prosecution has arisen, but as under our practice the cross-examination in a criminal case is limited to matters which are testified to in chief, her story is incomplete. The substance of the testimony, as given by her, is about as follows:
In 1908, she was employed by an oculist in this city, and had occasion now and then in his service to visit a shop or store with which he had dealings, and there made the acquaintance of Riehl, who was the book *540 keeper. The acquaintance was merely casual, however, and so remained until the latter part of 1910, or perhaps the early part of 1911 (long after she had left the employ of the oculist), when she met Riehl in a street car, and she testified that he bowed to Irel- and entered into conversation; that their --friendship ripened” from that time; that he visited her at the house of friends with whom she was making her home, though not to their knowledge; that she went out with him; that he made love to her; that upon July li, 1911, she yielded herself to him upon his promise of marriage; that she knew nothing about him at that time save his name, which he had told her, and the fact that he'had been employed where she first met him, and that she made no effort to learn anything more; that she communicated the fact of her engagement to no one; that in December, 1911, she xiressed Riehl to make good his promise to marry her, and was then informed by him that he was already married; that she became 26 years of age upon July 28, 1913. Riehl is shown to have had a wife and five children, several of whom were married daughters, and defendant is shown, after he began to neglect her, to have visited his house and to have made trouble with his family, in her search for him.
Applying the law to the situation as thus presented, we are of opinion that the question to be decided is governed by certain well-established rules, to wit:
That the judge of the district court is vested with a wide discretion in the matter of granting or refusing new trials in criminal cases, upon the ground of newly discovered evidence, and that this court will not reverse'his ruling unless it is made clear that such discretion has been abused, or that error has been committed. State v. Ferguson, 114 La. 70, 38 South. 23; State v. Lee, 127 La. 266, 53 South. 559; State v. Thomas, 127 La. 274, 53 South. 562.
[3] That, to entitle a defendant to a new trial upon such ground, it must appear that he exercised due diligence in order to discover the evidence before the original trial and conviction. Marr’s Cr. Jur. of La., § 482. That a new trial should not be granted for the introduction of merely cumulative evidence. Marr’s Cr. Jur. § 482.
[4] In the instant case the defendant had six months, during which, for aught that appears in the record, she was perfectly sane, and in which to determine whether she would set up the defense that she was insane at the moment of the homicide, and, if so, by what witnesses she would sustain that defense, and she knew as well during that time as she did afterwards that she had attracted attention by spending two days in the offices of Oastaing and Chabaud, who were strangers to her, and that they would be able to testify to her demeanor during the period of what must be supposed to have been her greatest mental disturbance, since she was then pursuing Riehl with the intention of killing him and, probably, herself. Moreover, the fact that she spent hours upon different days standing or sitting, in one place or another, waiting for the man for whom she was looking is fully established by the unchallenged testimony of other witnesses, and it might very well be developed in the future, and after a second conviction, if a new trial were granted, that, whilst her' mind was burdened with her trouble, and while she was seeking the author of that trouble, in order to hold him to account with his life, other persons than those observed peculiarities in her demeanor for which they were unable to account, and in such event another application for new trial could be demanded upon the same grounds as those which are now urged.
What has thus been said with regard to the testimony of the two lay witnesses applies with even greater force to the expert *542 alienists. The defendant alone knew, up to the day of the trial, and probably up to the time that the state had closed its case in chief, that she intended to rely upon the plea of insanity; and it does not appear that she made any effort at all to provide herself with witnesses qualified to testify as experts on that subject. It is alleged that she was without the means wherewith to compensate such witnesses, but that does not meet the objection, for the same witnesses who volunteered their services after the conviction would, no doubt, have done so before, had they been advised that such services were needed in the cause of humanity and charity. The state, however, called to the stand in rebuttal, the coroner of the parish and the physician in charge of the Gity Hospital for mental diseases, both of whom had known the defendant long before she became involved with Riehl, both of whom qualified as expert alienists, both of whom visited her in prison, one or both of whom heard the testimony as it was given by the witnesses on the trial of the case, and both of whom testified, in terms and in effect, that in their opinions the defendant was not insane, but was capable, at the time of the homicide, of distinguishing between right and wrong and governing her conduct accordingly. As the gentlemen mentioned were officials and were, probably, called in their respective official capacities, it must be assumed that they were equally without interest or pride of opinion to declare the defendant sane or insane, and they were therefore likely to have made as good witnesses for the defendant as for the state, or better, perhaps, if they could have allowed their sympathies to influence them in the determination of a scientific and psychological problem. They were exhaustively cross-examined by the learned counsel, by whom, under appointment by the trial court, the defendant has been most ably represénted, and it is to be presumed that the jury was satisfied with the conclusion reached by them.
For the reasons thus given, we are of opinion that the new trial was properly refused. The judgment appealed from is therefore affirmed.
O’NIELL, J., takes no part.